1. The award of the director was without any competent evidence to support it.
2. "Where a diseased condition of an applicant for compensation, which existed at the time of the injury, is aggravated or caused to `flare up' as a result of the injury, and produces a disability which otherwise might not have existed as a result of the injury, the incapacity is caused by the injury, and where the accident arises out of and in the course of the employment, compensation will not be denied upon the ground that the disability is a result of the disease."
 DECIDED OCTOBER 3, 1946. REHEARING DENIED NOVEMBER 14, 1946.
This is a workmen's compensation case. The claimant is William Royce Gunter, G. W. Summerour and Company is the employer, and American Mutual Liability Insurance Company is the insurance carrier.
The award of the single director was appealed by the claimant to the superior court, without first appealing to the full board. The judge of the superior court reversed the award of the director. The employer and carrier assign error on this judgment. The claimant in his application for a hearing before the State Board of Workmen's Compensation, aside from other requirements, included in the application, under the facts applicable to his case, in paragraph 2, the following: "That the nature of my injury is as follows: I had a very small rupture that was giving me no trouble. I was more seriously ruptured and entirely disabled me." And paragraph 6 of the application reads: "That as a result of this accident I sustained a permanent injury as follows: Rupture."
There appears in the record a brief of the evidence filed by the director. We quote in full this brief from the record. We feel, however, that there are some material inadvertent omissions, which *Page 501 
we will add after the brief is quoted. The brief of evidence is as follows:
"William Royce Gunter, claimant, testified in his own behalf in substance as follows: That he was employed by the Summerour Company, March 30, 1944, at which time he sustained an injury, resulting from a strip of plank striking him in the scrotum. At the time of the injury he was doing the work he was employed to do. That he notified his foreman of the accident and the foreman sent him to Dr. Randolph. That the plank struck him right in the center. That he had a hernia on the left side and had it for some ten or twelve years. That the injury complained of aggravated the condition. That his right side also gave him trouble. That he was hurt on the right side at the same time. He doesn't know whether he sustained a rupture or not on the right side. That he sustained a sharp pain. That the pain was continuous from the time of the accident up to the present time. That immediately following the accident there was a knot or bulging on the right side. He doesn't know whether the bulging amounted to rupture. That the first work he has done since the accident was working about five weeks at a grocery store in Gainesville, Georgia. That at the present time he can't lift anything. That he has to do light work. That at the time of the injury he was earning forty cents an hour, working eight hours a day, six days a week, earning $20.80 per week. That while working at the grocery store, he earned $18.00 per week.
"On cross-examination claimant testified that he went to see Dr. Randolph two or three times. That Dr. Randolph never did tell him to go back to work, but said: `I will see you any time you want to come back.' He went to see Dr. Randolph the same day he was injured and went again the next day. That thereafter he went to see Dr. Pharr, and Dr. Pharr gave him pills. It was less than a month from the last time that he saw Dr. Randolph that he went to see Dr. Pharr. He had been wearing a suspensory for some time, but quit wearing it about two months ago. He remembers going back to his former employer on June 17, and talking with Mr. Delay, at which time Mr. Delay told him he would give him light work. That he filled out a card, but without saying anything, left. Later, he went to work for C. J. Conyers at Gainesville. He applied for a job at Chicopee Mills. He doesn't remember the time. He also tried to get a job at New Holland. He doesn't remember *Page 502 
the date. The reason he didn't go back to the Summerour Company was because Mr. House told him to come back and he would give him light work and he went down there but they put him on heavy work. He never did resume work at the Summerour Company. He went around to see what kind of job they had offered. It was catching lumber off a resaw. The pieces of lumber were about thirty inches long and about three inches thick of different widths. They would weigh more than two pounds a piece. He doesn't know just how much they would weigh. They were about thirty inches long, about three inches thick, and anywhere from eight to twelve or fourteen inches wide. He was to take them off the saw, put them on a truck, and push the truck. He didn't try to do the job. When he left he didn't say anything to anybody as to why he was leaving. At the time he was injured he broke the skin on the left side. It didn't break the skin on the right side. Dr. Randolph treated him on the two trips he made to his office, but he didn't go back again. Dr. Pharr was his family physician. He preferred to go to his own family doctor. He has been to Dr. Pharr several times and the suffering is not changed. He is not able to work. He works because he has to. The reason he quit wearing the truss was that it gave him trouble. He has never worn a satisfactory one. He doesn't remember when he went to work for his present employer, but that he has worked there four or five weeks. He sells groceries and puts up orders for delivery. He was not wearing a truss at the time of the injury. He worked for Summerour and Company eight or nine months before the accident.
"Dr. W. T. Randolph, testified in behalf of the defendant, in substance as follows: That he saw claimant on March 30 and 31, 1944. He has not treated him since then, although he did examine him again on August 10, 1944. Claimant informed witness that he was working for the G. W. Summerour and Company and that a plank flew back from a planer and struck him in the groin. Claimant showed him where he was struck. It was in the left inguinal region just above the scrotum. Witness found some scratches or abrasions or breaking of the skin as if something had hit him there. Claimant told witness that he had been ruptured. Witness found a bulging on the left side at the time of the examination. Blow was right above the hernia. The skin was scratched and bruised and broken just over the hernial sac. Witness cleaned *Page 503 
the wound, as it had been bleeding, and put some kind of an antiseptic salve over it and dressed it. Witness didn't have a chance to dismiss claimant. He only saw claimant twice and claimant didn't come back. In witness' opinion the kind of scratches and abrasions which claimant suffered from should get well in two weeks time. He examined claimant on both sides and in his opinion claimant did not have a hernia on the right side. He examined claimant's right side both in March and August, 1944. Witness was in position to administer further treatment had claimant needed it.
"On cross-examination, witness testified that the second time he saw claimant he was not complaining as much as he was the first time. He doesn't know how much the claimant is suffering at the present time, and couldn't testify as to whether or not his ability is affected.
"Wiley Delay, testified in behalf of the defendant, in substance as follows: That he is superintendent of Summerour and Company. He is acquainted with claimant. He sent claimant to Dr. Randolph following the accident. Claimant came to him June 17, 1944, and asked for work at which time Mr. House, the manager of the office, came down and told witness that claimant was going back to work, to get him up a light job, and get the time card fixed up for him, which witness did, but when he went to look for claimant, claimant had gone. The job claimant was to do was to catch off behind the resaw. They were making ammunition boxes. The size of the pieces would vary considerably. They would range anywhere from twelve inches to twenty-eight or thirty inches. He didn't think any of the pieces would weigh over four or five pounds. Claimant didn't have to haul them away on a truck by himself. Two men always haul them. Claimant made no mention to witness about his ability to do the work. Witness reported to Mr. House and asked him if he knew what became of claimant.
"On cross-examination witness testified that claimant had been out several weeks. That he doesn't know what his condition was at the time. The weight of the trucks after they were loaded vary from one to three hundred pounds. Witness has been with Summerour and Company ever since 1933.
"Dr. L. P. Pharr, testified in behalf of claimant, in substance, as follows: He knows claimant. Claimant came to him pretty *Page 504 
soon after he was injured. He doesn't know the date, but it was shortly after the injury. He examined claimant and found a hernia on the left and right sides. He had a contusion, a little opening, that had not quite healed, and was smartly inflamed on the right side. He didn't know claimant had been to another doctor. The abrasion was on his testicles pretty close to the center. In his opinion the blow caused the rupture on his right side, although he doesn't know, he had not examined him, he had been his family physician quite a while. He examined him several times previous to the injury. He had a slight hernia on the left side. The injury aggravated it. Claimant can not get out and do much manual labor with the hernia. Lifting would strangulate it. He thinks claimant is about seventy-five percent disabled to do manual labor. He treated claimant for a considerable period of time. He expects the bill would run about $50.
"On cross-examination, witness testified that he could not tell the exact date he first examined claimant after the accident. He is pretty sure he had a record of it in his office. He had not thought much about bringing the records with him. He didn't have time to go down and get his records and bring them to Atlanta. He first saw claimant along the last of March. He can not state the exact date. He saw claimant off and on during the time he was working previous to the accident. He treated him at one time for influenza. He showed witness the hernia a time or two. The hernia was on the left side. The hernia was incomplete. He had no trouble prior to March, 1944, in diagnosing claimant's condition as a hernia. It was perfectly apparent that he had hernia on the left side prior to March, 1944. Claimant told him that he had been treated by Dr. Randolph. Witness' office is in Winder, Georgia. Dr. Randolph's office is in Winder. Their offices are three or four blocks apart. It was after claimant had been treated by Dr. Randolph that he came to see witness. The first time he saw claimant after the injury he couldn't tell how long he had the hernia. He doesn't know when claimant got the hernia on the right side. The hernia on the right side could have developed between the time Dr. Randolph saw claimant and the first time witness saw claimant after the accident. Witness gave claimant aspirin and anti-pain pills. He saw claimant a good many times, possibly fifteen or twenty times. The last time he saw claimant *Page 505 
was some month or six weeks ago. He gave him some treatment and told him to stay quiet in bed. The last time he saw claimant, claimant was at his brother-in-law's at Braselton. He was suffering worse on the right side. Witness didn't ask claimant where he was working when he saw him in December, 1944."
Additions to the claimant's testimony — The claimant testified: that he had had the hernia on the left side for ten or twelve years prior to the accident, and that it had never given him any trouble so far as working was concerned; that when he went back to the employer for work after the accident, the employer offered him a heavier job than the one at which he was working before the accident; that before the accident he was passing lumber to a planing machine, and the job which was offered him afterwards was catching lumber from a resaw, loading the pieces of lumber onto a truck and transporting the pieces across the plant; that he was not physically able to do the work they offered him after the accident; that he had been unable to do any lifting since the accident; that the truck load was heavy, there were holes all in the floor, and it was all a stout man could do to push the load; that since the accident claimant was 75 percent permanently disabled; that he had been working at a grocery store for about five weeks prior to the hearing; that all he had to do in the grocery store was to sell groceries and "get up" orders to be delivered; that he could hold no job except one in which he had resting periods; that at the time of the hearing he was not able to work at any job without considerable pain, and he could not do any job which required him to stand on his feet constantly; that out of an eight-hour-day's work he would have to sit down from two to four hours. The claimant also testified that the injury resulting from the accident caused him pains in his right side as well as in his left side, and that there was a bulging on the right side shortly after the accident, but that he did not know whether or not it amounted to a rupture of the right side.
Additions to the testimony of Dr. Randolph — The witness testified: that sometimes after the accident the employees would not come back to him (the employees' physician), because the employees might go to their family physician; that this might have been the reason why the claimant did not go back to the witness. The following questions and answers were elicited by the director: "Q. *Page 506 
You don't know whether any operation has been offered or not, of your own knowledge? A. He asked me if I was in position to operate; I could have taken care of him if he had been authorized; I had a son associated with me that could have taken care of him. Q. If the insurance company had offered him an operation, he could have performed it all right? A. Yes, sir."
Additions to the testimony of Wiley Delay — The witness did not know whether the claimant had looked at the job offered him, to see what it was, but he probably did. The witness did not know how bad the claimant was suffering, and did not know whether or not the work was too heavy for the claimant. The claimant would know better about this than the witness. The wheels on the cart of lumber, which the claimant was to handle on the job offered, were about eight inches in diameter, and the loads varied from 500 to 1000 pounds. There were dents in the floor over which the cart runs, and the cart was harder to push when it ran into the holes. The witness had been foreman for the employer since 1933 and was acquainted with the jobs around the mill. All the jobs are more or less heavy ones, and it takes an able-bodied man to do them. The handling of the timber is a grown-man's job. This was the best job that the witness could offer the claimant after the accident; he considered the job the lightest he could offer; and the claimant could earn his money at such a job.
Additions to the testimony of Dr. Pharr — The claimant is not fitted to do any labor other than manual, since he has no education. The accident aggravated the hernia on the left side; the abrasions from the accident were not healed when the witness examined the claimant; and he walked drawn over and could hardly get up the steps.
From the above evidence, the director found as a matter of fact that the claimant had sustained an accidental injury, which arose out of and in the course of his employment on March 30, 1944; and that the hernia on the left side was pre-existing at the time of the accident and had existed for 10 or 12 years. The director also found that the injury which the claimant had sustained in no way permanently aggravated the condition of the pre-existing hernia, on the left side; and that the accident did not result in hernia on the claimant's right side.
To the award of the director the claimant filed an appeal to the superior court on the following grounds: *Page 507 
"(a) His decision and award was without evidence to support it.
"(b) The decision of the director because of the evidence, taking into consideration that on behalf of the employer, demanded a finding and award that, from other causes than hernia sustained in the accident out of which the case arose, the claimant was disabled, had lost time, was entitled to the medical expenses claimed by him, and was seventy-five percent permanently disabled.
"There is not sufficient competent evidence in the record to warrant the decree in making the order or decree complained of because:
"(a) All of the evidence in the case demanded that, aside from any hernia sustained in the accident out of which the cause arose, the claimant was totally disabled in at least seventy-five percent, and that he was entitled to the doctor's bills for Dr. Pharr's services that he claimed.
"(b) Because all of the evidence demanded a finding that, aside from hernia, the claimant was disabled totally to a considerable extent.
"(c) That the evidence of hernia was such as to demand a finding contrary to the decree, order or award complained of.
"The order or decree is complained of as contrary to law for the reason: (a) That the director deciding the case decided it on the theory that the only question involved was whether the claimant sustained a hernia, when this was only one of the incidental issues in the case."
The judge of the superior court in reversing the award of the single director submitted, and it is a part of the record, his written opinion, as follows:
"I have carefully studied the record transmitted by the State Board of Workmen's Compensation in the above-stated case, and have examined the authorities cited by able counsel for both sides. The finding of fact by the director that the injury sustained by claimant on March 30, 1944, did not result in a hernia on claimant's right side within the provisions of the Code, § 114-412, is authorized by the evidence. I am, however, unable to agree to the conclusions implicit in the finding by the director that this injury `in no way or manner permanently aggravated the condition of the pre-existing hernia.' Neither can I agree to the construction placed by the director on the testimony of Dr. Randolph contained in the *Page 508 
director's finding that `Dr. Randolph testified from the condition of the injury he found March 30, 1944, claimant should have fully recovered from the effects thereof within a period of two weeks.'
"Concerning the hernia on claimant's left side, claimant testified that previous to the injury on March 30, 1944, he had `a little small hernia' on the left side; that the injury he sustained on that date caused that rupture to hurt worse and aggravated its condition; that from that time he suffered more severely with it; that on that left side pain became sharpened and acute immediately, and he has suffered with it worse since. Dr. Pharr testified that he was claimant's family physician and had examined him prior to the date of the injury complained of here for hernia; that claimant had shown him that hernia a time or two; that it was incomplete; that it was not pushed out so very far. Dr. Randolph testified that claimant gave a history on the date of the injury that a plank flew back from the planer where he was working and struck him in the left inguinal region; that he had evidence there that something had struck him; that claimant told him he had been ruptured, and there was a bulging there on the left side; that the blow was right over the hernia on the left side; the skin was scratched and bruised and broken just over the hernial sac; that he does not know how long that hernia was there beforehand; that the hernia he had could be disabling until it is repaired; the claimant asked him if he were in a position to operate; that he could have taken care of claimant with an operation if it had been authorized by the insurance company.
"The uncontradicted evidence further shows, as I construe it, that prior to and at the time of the accident claimant was doing heavy work; that he has been unable to do heavy work since that time, and did not resume any kind of work until about early October, 1944, in a grocery store in Gainesville, Georgia, earning $18 a week; that he returned to G. W. Summerour and Company for light work on June 17, 1944, but refused to take the work offered because he knew he was unable to perform it, on account of the injury sustained March 30, 1944.
"As was said by the Supreme Court in Lumbermen's MutualCasualty Company v. Griggs, 190 Ga. 277, 288, `While the (Workmen's Compensation) Act severely limits the maximum amount of recovery in a strong case of serious injury, and is in this respect *Page 509 
beneficial to the employer, it was the manifest purpose of the legislature to distribute a portion of such savings to the unfortunate employee whose case is weak but who is injured nevertheless. The purpose of the act is to alleviate human suffering and to contribute to human need when accidental injury is suffered in the manner prescribed by the statute. To construe the plain language of this statute to embrace only those accidents that are external, and to exclude those that are internal, is to quibble with distinctions where there are no differences.' The condition of the left hernia and the results from the blow immediately over this hernial sac of broken and bruised skin, described by Dr. Randolph, clearly corroborates claimant's testimony relative to the resulting effects to his left side of the accident. The inescapable conclusion from the testimony of claimant and the two physicians as to this left hernia, in my opinion, is that either the internal organs or viscera protruded through the inguinal opening, and there was a heavy blow on them by the accident, causing them to be severely bruised, and resulting in acute pain and inability to work for a time, or that the opening was made larger by the accident and a greater descension through it of the viscera resulted, at the time. The evidence demands, therefore, a finding that there was not only an external injury on the left ingunial region, but that claimant suffered internal injury in that region as well, in my view.
"It is firmly established in this State that an aggravation of a pre-existing disease or diseased condition may be compensable under the Workmen's Compensation Act. Perhaps the leading case in Georgia on this is Pruitt v. Ocean Accident Guaranty Corp.,48 Ga. App. 730 (3). It was held in Etna Casualty SuretyCompany v. Chandler, 61 Ga. App. 311, 314, that `an injury which aggravates a pre-existing disease is compensable where such increased result would not have occurred except for the injury' (citing Pruitt v. Ocean Accident Guaranty Corporation,
supra). It is stated in Griggs v. Lumbermen's Mutual InsuranceCompany, 61 Ga. App. 448, 450, that `The rule is that, where a previously diseased condition of a claimant for compensation under the Workmen's Compensation Act is aggravated by an injury or accident arising out of and in the course of the employment, and this results in disability to the claimant, there is a compensable injury;' and in Employers Liability InsuranceCorporation v. Johnson, *Page 510 62 Ga. App. 416, 421, the Court of Appeals holds that `the aggravating, acceleration, or lighting up of a pre-existing latent infirmity may constitute a disability of such a character as to come within the meaning of the Workmen's Compensation Act, even though the accident would have caused no injury to a perfectly normal healthy individual.' A different rule exists perhaps in some States. However, supported by the principle announced by our Supreme Court in Lumbermen's Mutual CasualtyCompany v. Griggs, supra, and by our Court of Appeals in numerous cases, it is my opinion that the rule in this State applicable to the facts of the instant case is expressed in 71 C. J. 622, Number 374, that `an injury consisting of an aggravation into a disabling condition of a pre-existing hernia, . . (is) an "aggravation of a disease" existing prior to the injury,' and is compensable under our Workmen's Compensation Act. I know of no rule of law in this State that such an aggravation must produce a permanent disability in order to be compensable, as indicated by the director.
"The only testimony I find in the record on which the Director makes a finding that Dr. Randolph testified claimant should have fully recovered from the effects of the injury within a period of two weeks is the following: `Q. How long in your opinion should he (claimant) have been disabled from the injury you treated him for? A. Well, after we didn't see him and he didn't come back and thinking of it and looking at the record, I figured those kind of scratches or abrasions would get well in two weeks.'
"Thus it will be seen that the two-weeks'-recovery period testified to by Dr. Randolph referred only and solely to the external injuries of scratches and abrasions. The testimony is uncontradicted that claimant was disabled from doing his regular job; that this disability was total for a longer period than two weeks, and then was partial for a period. The evidence as to the length of such periods of time the respective incapacities existed is not sufficiently definite to be the basis of an award.
"Accordingly, it is considered, ordered, and adjudged in the above-stated case that the award of the Director of the State Board of Workmen's Compensation be and same is set aside and vacated; that the case be and is recommitted to the said board as provided by Code, § 114-710, to hear evidence as to the period of time claimant was totally disabled, and as to the period of time he was partially *Page 511 
disabled, and upon findings therefrom make an award of compensation to claimant in accordance with and in conformity to the opinion and judgment of the court herein."
(Signed) "Clifford Pratt, Judge, Barrow Superior Court."
1. We have not set forth in detail the findings of fact by the director. A good many of them we deem unnecessary to a determination of the issue before us. The material question is whether there is any evidence to sustain the award of the director, and if so, this court must reverse the judgment of the superior court. On the other hand, if the evidence demands a finding in favor of the claimant, then it is the duty of this court to affirm the judgment of the superior court. In the outset we might state that the finding of the director, to the effect that the evidence does not sustain a finding that the injury resulted in a hernia on the right side and that the pre-existing hernia on the left side did not entitle the claimant to compensation under the Code, § 114-412, is correct. This section deals exclusively with the principle of law regarding compensation for hernia or for death therefrom. Therefore it necessarily follows that, unless the evidence shows that the claimant is entitled to compensation for total or partial disability under some other principle of law under the Workmen's Compensation Act, the claimant is not entitled to prevail in this case. Able counsel for the employer and carrier cite a number of decisions to sustain their contention that this court — in the discharge of its duty to construe the award most favorably to the employer and insurance carrier so as to sustain it, and by applying the principle that, if there is any competent evidence to sustain the award, it must be upheld — should uphold it. Let us examine these decisions. In Sullivan v. Social CircleCotton Mills, 41 Ga. App. 714 (154 S.E. 467), a hernia case, this court said: "Accordingly, since the evidence in the instant case authorized the finding of the Industrial Commission that the only disability suffered by the claimant by reason of an accident arising out of and in the course of his employment consisted in pain and suffering from a hernia which existed prior to the accident, the award of the commission denying compensation was authorized and can not be set aside. Especially would such a rule *Page 512 
apply where, as here, the medical testimony authorized the conclusion that the fall sustained by the claimant merely knocked off his truss, and caused a temporary protrusion of the intestines through the existing hernia, and that there was no enlargement or aggravation of the pre-existing hernia condition." We do not see that the opinion in that case, under its facts, is applicable to the instant case under its facts. In that case there was only a temporary protrusion of the intestines through the existing hernia, and there was no enlargement or aggravation of the pre-existing hernia condition. In the instant case, there was a small hernia, according to the undisputed evidence, which had existed for ten or twelve years and had not interfered with the claimant's performance of hard manual labor; and the result of the injury caused an enlargement and aggravation of the pre-existing hernia condition. The uncontradicted evidence of the present claimant is that the pre-existing hernia condition resulted in partial disability to the extent of 75 percent, and that this disability did not exist prior to the accidental injury. The physician of the employer and carrier did not contradict this evidence in any way. Dr. Randolph, while on the stand, was asked certain questions concerning this issue. We give his testimony:
"Q. Dr. Randolph, you don't know whether this boy suffered more intensely from this injury after he had the blow or not, do you? From the blow he had whether it affected him and hurt him internally there or not, do you? A. The second time I saw him he was not complaining any more — as much as he was the first time. No, sir. Q. But you don't know how much he was suffering with it, do you? A. No, sir. Q. And you don't know whether he is still suffering with it or not, do you? A. No, sir. Q. And you don't know whether it really affected his ability up to now, do you? A. I couldn't testify as to that."
In connection with this testimony of Dr. Randolph, we might call attention to a conclusion of the director in his findings of fact:
"It will be further noted that Dr. Randolph testified that from the condition of the injury he found March 30, 1944, claimant should have fully recovered from the effects thereof within a period of two weeks." This is an erroneous conclusion of the director, which the testimony of Dr. Randolph does not sustain. On this point we quote the testimony of the doctor: *Page 513 
"Q. How long in your opinion should he have been disabled from the injury which you treated him for? A. Well, after we didn't see him and he didn't come back and thinking of it and looking at the record, I figured those kind of scratches or abrasions
would get well in two weeks." (Italics ours.) It will thus be noted that Dr. Randolph did not know anything concerning the pre-existing hernia condition of the claimant prior to the accidental injury, nor did he know the extent of it. And at the hearing he plainly stated that he could not testify as to whether the injury resulting from the accident aggravated the hernia condition on the left side and thus caused a partial disability. In this connection it will also be noticed that Dr. Randolph nowhere testified that the injury resulting from the accidental injury would cease to exist within two weeks from the date of the accident. He merely stated that he thought from having examined the claimant on March 30, 1944 and March 31, 1944, and not having seen him again until August, and looking at the record, "I figured those kind of scratches or abrasions would get well in two weeks." (Italics ours.) This testimony was merely to the effect that the external evidences of the plank striking the claimant would heal within two weeks, and not that the aggravated hernia condition received by the claimant would cease completely in two weeks.
Another case called to our attention is Keel v. AmericanEmployers Insurance Co., 44 Ga. App. 773 (162 S.E. 847), to the effect that the finding of the director should be sustained because there was competent evidence to support the award, on the ground that the claimant had refused employment as contemplated by the Code, § 114-407. This section provides that, if an injured employee refuses employment procured for him, suitable to his capacity, he shall not be entitled to any compensation at any time during the continuance of such refusal unless in the opinion of the department such refusal was justified. There is no competent evidence to the effect that the work offered was suitable to the capacity of the competent evidence demanded a finding that the work offered was not suitable to the capacity of the claimant to perform it. This is borne out by the testimony of the claimant, of Dr. Pharr, and of the foreman of the employer, Delay. We will not discuss this evidence in detail, but merely refer to the evidence of these *Page 514 
witnesses in the brief evidence, hereinbefore set out, and the additions thereto. In this connection, our attention is also called to the decision in American Mutual Liability Ins. Co. v.Bond, 62 Ga. App. 562 (8 S.E.2d 715). That case involved a hearing on a change in condition. The evidence was in sharp conflict, and there was competent evidence to the effect that there had been no change in the condition of the claimant. This being true, the court rendered an opinion to the effect that the judge of the superior court was without authority to disturb the award of the board. The facts in that case differentiate it from the instant case.
The next case called to our attention is Bradberry v.Lumbermen's Mutual Casualty Co., 60 Ga. App. 576 (4 S.E.2d 486). That case rested on the proposition that the evidence was based only on opinion testimony on both sides, that it was conflicting, and that it was for the board to decide which view it would accept. In the instant case, there is no contradictory evidence that the claimant was not partially incapacitated for work. Counsel for the employer and carrier contend that the present facts fall squarely within the rulings of the Supreme Court in Liberty Mutual Ins. Co. v. Blackshear, 197 Ga. 334,336 (28 S.E.2d 860). That case dealt with compensation for hernia under the Code, § 114-412, and as we have heretofore stated, the claimant in the instant case is not entitled to compensation under the provisions of that section. In that case, however, the Supreme Court, citing Cooper v. Lumbermen'sMutual Casualty Co., 179 Ga. 256, 261 (175 S.E. 577), held as follows: "In order to render any finding of fact demanded as a matter of law, not only must there be no controversy in the evidence material to the issue involved, but the implications and inferences which logically and properly arise from the evidence must necessarily lead to only one conclusion." It is our opinion that, applying this rule to the facts of the instant case, there was no controversy in the evidence material to the issue involved — that is, that the claimant was partially disabled — and there are no implications or inferences that can be drawn from the evidence which lead to any contrary conclusion. We are not unmindful that the board in arriving at the truth may apply all the rules of law with reference to the credibility of the witnesses testifying, their intelligence, their means and opportunity of knowing facts to which they testify, the nature of the facts to which they testify, and the probability or improbability of *Page 515 
their testimony, their interest or want of interest, and also their personal credibility so far as the same legitimately appears from the trial. But applying this rule, it still appears from the evidence that the uncontradicted competent testimony demanded a finding that the claimant was partially disabled as a result of the accidental injury. We do not understand this rule to mean that a fact-finding body may absolutely disregard uncontradicted, unimpeached testimony and base a finding contrary to it, where, as here, no circumstances are involved to sustain such a disregard of the sworn testimony. It is the duty of the fact-finding body to reconcile the testimony, if possible, even where it is conflicting, and not impute perjury to anyone. It is also the law that a witness is presumed to speak the truth while testifying. We do not think that it was ever the intention of the law that the State Board of Workmen's Compensation should, without rhyme or reason, make an award contrary to competent, uncontradicted, and unimpeached testimony, and substitute in lieu thereof an award based on no competent testimony. And we do not think that the rule above-quoted from the Cooper case holds to the contrary. As to the principle that this court should construe the testimony most favorably to the employer and carrier in the instant case, see Merry Bros. Brick Co. v. Holmes, 57 Ga. App. 281
(195 S.E. 223); Glens Falls Indemnity Co. v.Sockwell, 58 Ga. App. 111 (197 S.E. 647). See also LibertyMutual Ins. Co. v. Holloway, 58 Ga. App. 542
(199 S.E. 334), which counsel for the employer cite. As pointed out in the opinion of the judge of the superior court the Supreme Court said in Lumbermen's Mutual Casualty Co. v. Griggs, 190 Ga. 277
(9 S.E.2d 84): "While the [Workmen's Compensation] Act severely limits the maximum amount of recovery in a strong case of serious injury, and is in this respect beneficial to the employer, it was the manifest purpose of the legislature to distribute a portion of such savings to the unfortunate employee whose case is weak but who is injured nevertheless. The purpose of the act is to alleviate human suffering and to contribute to human need when accidental injury is suffered in the manner prescribed by the statute. To construe the plain language of this statute to embrace only those accidents that are external, and to exclude those that are internal, is to quibble with distinctions where there are no differences."
2. As we have heretofore stated, the claimant in the instant case was not entitled to recover under the Code, § 114-412, for *Page 516 
compensation for hernia, but we are of the opinion that, under the uncontradicted, competent, and unimpeached testimony, he was entitled to compensation for partial disability from the hernia condition which existed prior to the accident, because of the aggravation of such condition. This court held in Pruitt v.Ocean Accident c. Corp., 48 Ga. App. 730 (3) (173 S.E. 238): "Where a diseased condition of an applicant for compensation, which existed at the time of the injury, is aggravated or caused to `flare up' as a result of the injury, and produces a disability which otherwise might not have existed as a result of the injury, the incapacity is caused by the injury, and where the accident arises out of and in the course of the employment, compensation will not be denied upon the ground that the disability is a result of the disease." This principle of law is approved also in Etna Casualty Surety Co. v. Chandler,61 Ga. App. 311 (6 S.E.2d 142), Employers' Liability c. Corp.
v. Johnson, 62 Ga. App. 416, 421 (8 S.E.2d 542), andGriggs v. Lumbermen's Mutual Casualty Co., 61 Ga. App. 448
(6 S.E.2d 180), which are cited and quoted in the opinion of Judge Pratt, hereinbefore quoted. We see no difference in principle between the aggravation of a pre-existing hernia condition and an aggravation or flaring up of the pre-existing diseases, under the facts in the cases above cited.
Therefore, from what we have said, it follows that the judge of the superior court did not err in reversing the award of the single director, and the judgment is affirmed.
Judgment affirmed. Sutton, P. J., and MacIntyre, J., concur.Parker, J., concurs specially. Broyles, C. J., and Felton, J.,dissent.